## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michelle Carter,                                    Civil No. 07-1464 (DWF/AJB)

        Plaintiff,

v.                                                  **MEMORANDUM**
                                                    **OPINION AND ORDER**

Dayton Rogers Manufacturing Co.,

        Defendant.

_____

Steven Andrew Smith, Esq., and Amy S. York, Esq., Nichols Kaster & Anderson, PLLP, counsel for Plaintiff.

David A. Davenport, Esq., Winthrop & Weinstine, PA, counsel for Defendant.
_____

### INTRODUCTION

This matter is before the Court pursuant to a Motion for Summary Judgment brought by Defendant Dayton Rogers Manufacturing Co. ("Dayton Rogers"). Plaintiff Michelle Carter moves for partial summary judgment. For the reasons stated below, Dayton Rogers' Motion for Summary Judgment is granted in part and denied in part; Carter's Motion for Partial Summary Judgment is denied.

### BACKGROUND

Carter has sued her former employer, Dayton Rogers, alleging that it discriminated against her based on her gender and retaliated against her for complaining about the discrimination. In her Complaint, Carter asserts the following causes of action: (1) retaliation in violation of Title VII, 42 U.S.C. § 2000e-3; (2) reprisal in violation of

the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.15; (3) gender

discrimination in violation of 42 U.S.C. § 2000e-2(a)(1) & (2); and (4) gender

discrimination in violation of the MHRA, Minn. Stat. § 363A.08, subd. 2.

Dayton Rogers manufactures and supplies precision metal-formed products.  The

company has corporate offices in Minneapolis and operates six divisions across the

country.

Ron Lowry has been President of Dayton Rogers since July 1, 2002.  He was

promoted to the position after having served as Vice President and General Manager of

Dayton Rogers' California division.  Prior to his promotion, Lowry discussed with

Dayton Rogers' owner, John Seeger, Jr., a corporate re-structuring plan that Lowry

wanted to implement after he became President.  After Lowry became President, he

followed through with his plans and implemented a re-structuring that included

(a) eliminating the company's Vice President of Operations position; (b) changing the

Vice President of Research and Development position to a Director-level position; and

(c) changing the Vice President of Human Resources position to a Director-level position.

 (Affidavit of Ron Lowry at ¶ 6.)  Lowry downgraded the Human Resources and

Research and Development positions because he "believed that the responsibility of these

two positions was not at a Vice President level."  (*Id.* at ¶ 5.)

John Moylan had served as Vice President of Human Resources at Dayton Rogers

from 1975 until he decided to retire in the summer of 2002.  (Aff. of Steven Andrew

Smith ("Smith Aff.") ¶ 3, Ex. E (Dep. of John Moylan ("Moylan Dep.")) at 8, 10; Lowry

2

Aff. ¶ 7.)  At the time of his retirement, Moylan's salary was $70,000.  (Lowry Aff. ¶ 9.)

As part of his benefits package, Moylan received a company car, including car insurance

and maintenance, and an option for an annual physical as part of his Vice President

position.  (Moylan Dep. at 10; Lowry Aff. ¶ 7-8.)  According to Lowry, Dayton Rogers'

policy is to provide these benefits to its Owner, President, and Vice Presidents, but not to

other employees.  (Lowry Aff. ¶ 10.)  The company has no formal policy to delineate

which corporate employees receive such fringe benefits.  (Smith Aff. ¶ 3, Ex. G.)

In August 2002, Dayton Rogers advertised for its Director of Human Resources

position.  (Aff. of David A. Davenport ("Davenport Aff.")) ¶ 4, Ex. C.)  After

interviewing a number of candidates, Moylan and Mark Spicza, Dayton Rogers' Vice

President of Finance, Secretary and Treasurer, identified Carter and one other female

candidate as the most qualified applicants.  (Moylan Dep. at 22; Smith Aff. ¶ 3, Ex. C

(Dep. of Mark Spicza ("Spicza Dep.") at 45.)  Lowry selected Carter for the position and

offered her the position of Director of Human Resources verbally and then by a letter

dated October 22, 2002.  (*Id.*; Davenport Aff. ¶ 7, Ex. F; Smith Aff. ¶ 3, Ex. D (Dep. of

Michelle Carter ("Carter Dep.")) at 39.)

Carter contends that at various meetings, Spicza, Moylan, and Vice President of

Operations, John Streit, all communicated that Carter would be replacing Moylan.  (Smith

Aff. ¶ 3, Ex. D (Carter Dep. at 32).)  None of these people specifically told Carter that she

would be given the title of Vice President.  (*Id.*)  Yet it appears that Carter took their

statements to mean that she would become Vice-President of Human Resources.  (Pl.'s

3

Mem. of Law in Opp. to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Mot. for Summ. J. and Mot. for Add'l Discovery under Rule 56 (f) ("Pl.'s Response") at 3.)  Carter asserts that she did not know that the position was a Director-level position until after she had accepted the offer of employment.  (Carter Dep. at 29-30.)

Carter's starting annual salary was $105,000.  (Davenport Aff. ¶ 7, Ex. F.)  Lowry stated that because Carter was not hired as a Vice President, she was not offered a company car or the optional annual physical.  (Lowry Aff. at ¶ 11.)

Prior to the start of Carter's employment at Dayton Rogers in December 2002, Lowry sent out a company-wide memorandum announcing that Carter had been hired as Director of Human Resources.  (Davenport Aff. ¶ 9, Ex. H.)  On December 5, 2002, after Carter began working at Dayton Rogers, she sent a company-wide memorandum introducing herself as Director of Human Resources.  (*Id.* ¶ 10, Ex. I.)

Carter began working at Dayton Rogers before Moylan retired as Vice President of Human Resources.  After Carter began work, Dayton Rogers appointed her as an Officer in order to allow her to administer the company's 401K retirement and defined-benefit pension plans.  (Aff. of Mark Spicza ("Spicza Aff.") at ¶ 2.)  According to Spicza, the company believed that Officer status was necessary so that Carter could sign documents associated with benefit plans.  (*Id.*)  The parties dispute Carter's initial reporting structure.  Dayton Rogers contends that Carter initially reported to Lowry and Spicza.  (Smith Aff. ¶ 3, Ex. B (Dep. of Ronald Lowry ("Lowry Dep.") at 22, 62; Spicza Dep. at 26).)  Carter asserts that up until the end of her tenure with Dayton Rogers, as noted below, she

reported exclusively to Lowry.  (Carter Aff. ¶ 4.)  Carter's job duties included Moylan's

duties as well as some additional duties that Moylan had not performed.  (Lowry Dep. at

33, 91.)

Sometime in the summer of 2003, Carter realized that she was not receiving the

same benefits as Moylan had received as Vice President of Human Resources.  (Carter

Dep. at 61-63.)  On September 21, 2004, Carter sent the following e-mail to Lowry:

> I have to ask.  I am about to purchase another vehicle and store the BMW
> for the winter.  Before I go out and buy another vehicle, I wanted to ask if
> there was any chance I will be included in the group to receive a company
> vehicle.  I mean no offense.  I ask because John [Moylan] had a vehicle, and
> I am the first and only officer who has not received one.  I am NOT
> disgruntled about that—I am happy either way, but I'd be happier without
> an extra vehicle payment!!

(Davenport Aff. ¶ 12, Ex. K.)  Lowry responded:

> Being an Officer does not mean that you will have a company vehicle, an
> Officer position simply means that you can sign legal documents for the
> company.  When I became President I made a decision to supply company
> vehicles to the Vice President and above positions only.  When I changed
> the VP of R&D and the VP of HR positions to Directors, I eliminated the
> vehicles along with that decision.  I feel that it is the correct position for me
> to take.

(*Id.*)  Carter replied:

> Ow!  That didn't go over very well.  I expected a "no" but I was hoping I
> wouldn't bug you with my question.  You know I have high respect for you.
>
> You should know that I was told I was being hired as the VP of HR when I
> was being interviewed and subsequently hired.  I thought it was just an
> oversight that my title was not changed when John left, and frankly didn't
> think it made a whole lot of difference and I didn't really care.  Now I
> understand it was intentional that I was called "Director", and that there is a
> difference.  As for my thinking it had to do with being an officer—there

5

isn't an officer without a car except me.  Eric, who was demoted from a VP
to a Director was removed of his officer status too.

Regardless, I'm very happy here.  Thank you for clarifying.  And you won't
hear about this again from me.  I am just in a financial crunch and thought
I'd ask about this.

(*Id.*)  Lowry responded:

There is [sic] no negative feelings on my end and I'm glad you asked—
please feel free to discuss it or anything with me in the future.  That's the
problem with email as if you would have seen me face to face you could tell
I wasn't upset about it—let's just talk in person next time OK.
. . .
Sometime let's discuss the VP thing.

(*Id.*)

In November 2004, Lowry gave Carter additional responsibilities as Safety

Director for the entire company.  (Carter Dep. at 75-6.)  Carter asserts that she spoke with

Lowry at the time, again inquiring about the VP situation.  (*Id.* at 76.)  However, Carter

contends that Lowry told her to "have faith in him" and that he "just needed to get

through January" and they would discuss it again.  (*Id.*)  This apparently led Carter to

believe that he was going to make her a Vice President.  (*Id.*)  Carter contends that

because Lowry had previously addressed a benefits disparity regarding the company's

Key Group Bonus Program, she believed that Lowry would make a similar adjustment to

her job title and benefits.  (Carter Dep. at 65.)

In September 2005, Carter again confronted Lowry about the VP title and benefits.

(*Id.* at 96.)  Carter contends that she told Lowry that it was "blatant discrimination" and

that "the first time that they have a female executive they don't give her the same

6

consideration that they do to their male executives."  (*Id*.)  In notes which appear to have

been taken contemporaneously with this confrontation occurring, Lowry noted that Carter

"feels singled out and everyday it is pointed out to her that she is not on the same level as

the rest."  (Third Aff. of David A. Davenport ¶ 2, Ex. Q.)  Lowry noted, "she articulated

to me that not having the perk of a car that comes with the VP title is what the problem is.

She feels that since she does not have a car she is being singled out."  (*Id*.)  Lowry also

noted, "I asked her directly if she was accusing me of discrimination against her since she

is female.  She said no but that's what it looks like and it is the perception of some

people—didn't state who or how many."  (*Id*.)  Further, Lowry wrote, "I told her that I

would once again check with Mark [Spicza] and what she was told and get back to her in

the future."  (*Id*.)

On November 11, 2005, Carter raised the VP issue again.  In an email sent to

Lowry, Carter stated:

> Ron, I'm really glad you are continuing to value my participation at the
> executive level, despite the fact that I'm sure I have made you feel like I've
> backed you into a corner on the issue of the "VP thing" (I feel bad about
> that).  It's appreciated.  I hope you know that I am trying so hard on that
> issue because it bothers me hugely yet, I want to continue working here.  I
> like it here!!!!  Is there any chance AT ALL that I can be brought up to the
> same as the others????  What can I do to help you make that change??????
> I'll do just about anything because it's the only thing that is creating any
> negativity for me at all.  I hope you understand, and I truly do not want you
> to feel defensive/negative.

(Davenport Aff. ¶ 13, Ex. L.)  Lowry responded:

I will be back next Friday from my trip to Chicago and we will sit down and talk about it then.  I want you to stay and be happy here so we do need to talk.

(Smith Aff. ¶ 3, Ex. H.)

Lowry and Carter met on November 18, 2005.  Carter asserts that during that meeting, Lowry told her that he was not going to change her title, so she should think about whether she wanted to continue working at Dayton Rogers.  (Carter Aff. ¶ 4.)  In addition, Carter asserts that Lowry told her that he was considering changing her reporting structure so that she would no longer report directly to him, but rather to Spicza "because he didn't think that he could work with me."  (Carter Aff. ¶ 4.)  In his notes, Lowry stated, "I told her that she needs to decide if she wants to work here under these circumstances and can be productive . . . ."  (Third Aff. of David A. Davenport ¶ 3, Ex. R.)

On November 19, 2005, Carter took a half day of vacation and Lowry admonished or reprimanded her for not informing him that she would be out of the office.  (Carter Dep. at 123-24.)  Carter contends that Lowry was attempting to build a case in order to terminate her, as Lowry's policy was that executives needed to notify him if they would be out of the office for a day or more—not for a half-day.  (Carter Dep. at 124-27.)

On November 28, 2005, Carter filed discrimination charges with the Minnesota Department of Human Rights ("MDHR") and the Equal Employment Opportunity Commission ("EEOC").  After she filed her discrimination charges, Carter continued to work at Dayton Rogers.  Carter contends that Lowry began excluding her from decisions

8

of which she normally would have been included.  For instance, Carter asserts that Lowry hired a new employee without consulting her, and then expected her to complete the necessary paperwork without giving her the information that she needed in order to process his request.  (Carter Dep. at 143-44.)

Carter asserts that on Friday, May 5, 2006, she told Lowry that she felt that Lowry was retaliating against her for filing the discrimination charge.  (Carter Dep. at 152.)  On the following Monday, May 8, Spicza and Thomas Pilon, Dayton Rogers' Vice President of Information Systems, met with Carter.  Spicza and Pilon told Carter that she would now report solely to Spicza.[1]  Lowry testified that he made the reporting change:

> Because Shelly had filed the retaliation claim, and in an effort to try to get something positive out of the HR department, I told her that I was going to move her reporting status from a shared reporting to Mark and I to working for Mark.  I thought it would make it more comfortable for her, and I had that done – had Tom Pilon and Mark Spicza have that conversation with her.
> . . .
> It's my testimony that I [changed the reporting structure] to make it more comfortable for her and I, but she was already reporting to Mark so I wouldn't call it a change of reporting status.

(Lowry Dep. at 62-63.)  Lowry testified that he did not view the change in reporting structure as a demotion.  (*Id*. at 63.)  Lowry further testified that he and Carter "reached a point where we weren't able to work together because, you know, it was very uncomfortable, well, for both of us."  (*Id*. at 64.)

---

[1]      As noted above, Carter contends that prior to May 8, 2006, she reported solely to Lowry.  (Carter Dep. at 152.)  Dayton Rogers contends that, prior to this date, Carter reported to Lowry and to Spicza.

Carter filed a second discrimination charge with the MDHR and EEOC in June 2006.  On January 29, 2007, the MDHR issued its decision as to Carter's second charge, finding no probable cause.  (Lowry Dep. at 53.)

Dayton Rogers asserts that Carter's performance deteriorated throughout 2006.  Lowry testified that, consistent with his prior practice, he surveyed the Vice Presidents of the various divisions in January 2007 to evaluate all of the corporate services provided to the divisions.  (Lowry Dep. at 58-59.)  Lowry allegedly memorialized the conversations that he had with the various Vice Presidents in a memorandum dated February 6, 2007.  (Davenport Aff. ¶ 14, Ex. M.)  According to Lowry, the plant managers expressed that they did not have confidence in Carter, that they did not value her opinion, and that they did not trust her.  (*Id*.)  In addition, the February 6, 2007 memorandum noted that at least one person surveyed commented that he had sought an outside source to verify things Carter told him.  (*Id*.)

Purportedly based on these comments, Dayton Rogers terminated Carter on February 9, 2007, just eleven days after the no-probable-cause decision came out.  Spicza and Pilon met with Carter, telling her that she would be terminated because Dayton Rogers was "moving in a different strategic direction" with the Human Resources Department.  (Spicza Dep. at 14-15.)  Spicza and Pilon did not tell Carter that she was being terminated for performance reasons, nor did they tell Carter about the alleged survey that was described in Lowry's February 6, 2007 memorandum.  (Carter Aff. ¶ 8.)

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### II.   Gender Discrimination

Carter alleges that she was discriminated against on the basis of her gender in violation of Title VII and the MHRA. The parties agree that the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to the determination of whether Dayton Rogers is entitled to summary judgment on Carter's claims. *Wells v. SCI Mgmt., L.P.,* 469 F.3d 697, 700 (8th Cir. 2006). Under the *McDonnell Douglas* framework, if Carter establishes a prima facie case of gender discrimination, the burden shifts to Dayton Rogers to produce a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 701. If Dayton Rogers is able to articulate such a reason, the burden then shifts back to Carter to show that the proffered reason is merely a pretext for discrimination. *Id.* The elements and analysis of discrimination under Title VII and the MHRA are the same. *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003).

In order to establish a prima facie case of gender discrimination, Carter must demonstrate that she (1) is a member of a protected group; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination. *Wells,* 469 F.3d at 701. The fourth element can be met by demonstrating that similarly-situated employees of the opposite sex were treated differently. *Id.*

Carter bases her claims of discrimination on the allegation that she received benefits at a significantly different level than similarly-situated men. Specifically, Carter points to the company car and the option for an annual physical.

12

The Court finds no merit to Carter's claims of gender discrimination.  Although it is true that Carter did not receive the same fringe benefits as Moylan, Carter was hired as a Director, not a Vice President.  Because she held a Director-level position, Carter was not similarly situated to other Officers or Vice Presidents who received such benefits.  Carter has provided no evidence to rebut Dayton Rogers' assertion that Lowry's decision to make the head of Human Resources a Director-level, rather than Vice President-level, position occurred as a result of Lowry's restructuring plan and took place before she was interviewed or hired.  It is difficult for Carter to maintain that the effects of the restructuring were directed at her because of her gender when the decision to re-structure occurred before she was hired.  Moreover, Carter does not refute Dayton Rogers' assertion that Nick Simons, another Officer of Dayton Rogers, did not receive a company vehicle or an annual physical option.  (Second Affidavit of Ronald Lowry at ¶ 2-3.)  Thus, Carter has not identified similarly-situated male Directors or Officers who were treated differently.  Nothing else in the record points to gender discrimination in any manner.  As a result, Carter has not established a prima facie case of gender discrimination and Dayton Rogers' Motion for Summary Judgment is granted on Carter's gender discrimination claims.

## III.   Retaliation

Carter also asserts that Dayton Rogers retaliated against her after she reported her claims of gender discrimination.  In order to establish a prima facie case of retaliation, Carter must demonstrate that (1) she engaged in statutorily-protected conduct; (2) Dayton

Rogers took adverse employment action against her; and (3) a causal connection exists between the two. *Wells,* 469 F.3d at 702. As noted above, if Carter establishes a prima facie case, the burden of production shifts to Dayton Rogers to show a legitimate, nondiscriminatory reason for its action. Then, Carter must establish that the proffered nondiscriminatory reason was mere pretext.

Carter complained of discrimination to Lowry and also filed two MDHR/EEOC charges. There is no dispute that this was statutorily protected conduct. And Lowry admittedly changed her reporting structure "[b]ecause [Carter] had filed the retaliation claim . . . ." (Lowry Dep. at 62-63.) Then, eleven days after Dayton Rogers received the MDHR /EEOC no-probable-cause finding, Carter was terminated. The change in reporting structure and termination qualify as adverse employment actions.

The parties mainly dispute whether a causal link exists between the adverse actions and the protected conduct. The Court finds that the timing and circumstances of Carter's termination are suspicious, at best. Although there are no documented issues regarding Carter's performance in the four years prior to her filing the MDHR/EEOC charge, Lowry, the same individual accused of discrimination, suddenly decided to informally survey Carter's performance with the other divisions. Lowry did not retain notes of his conversations with the managers, but merely documented their alleged responses in the February 6, 2007 memorandum. Dayton Rogers asserts that the survey was unbiased because the general managers from whom the survey results derived were unaware of Carter's claims of gender discrimination. Yet because of the informal, oral nature of the

14

survey, there is no documentation of the questions that Lowry asked of the general managers or the manner in which they were asked.  An inference can be drawn from the nature of the survey that Lowry, who was not unbiased, may have solicited feedback from the managers in a manner that elicited adverse comments about Carter.  Moreover, because Lowry did not retain the notes of his conversations with the managers, it is not clear that the negative picture painted by the February 6, 2007 memorandum accurately represents the overall comments that he received.  A reasonable jury could conclude that Lowry's motivation to seek feedback on Carter's performance was motivated by her discrimination charges.  Considering the totality of the circumstances surrounding the change in Carter's reporting structure and her termination, both of which occurred following her complaints of discrimination and her filing of the MDHR/EEOC charges, the Court finds that genuine issues of material fact exist as to whether Dayton Rogers retaliated against Carter.  As a result, Dayton Rogers' motion is denied on Carter's retaliation claims.

## CONCLUSION

The Court grants Dayton Rogers' Motion for Summary Judgment on Carter's claims of gender discrimination but denies the motion on Carter's claims of retaliation. The Court declines to adopt Carter's position that the gender discrimination claim should remain alive pending further discovery.

For the reasons stated, **IT IS HEREBY ORDERED** that:

1.     Defendant Dayton Rogers' Motion for Summary Judgment (Doc. No. 31) is

**GRANTED IN PART** and **DENIED IN PART**, as follows:

a.     Defendant Dayton Rogers' Motion is **GRANTED** as to Plaintiff's

gender discrimination claims (Counts IV and V).  Therefore, Counts IV and V of

the Complaint (Doc. No. 8) are **DISMISSED WITH PREJUDICE**;

b.     Defendant Dayton Rogers' Motion is **DENIED** as to Plaintiff's

claims regarding retaliation.

2.     Plaintiff Michelle Carter's Motion for Summary Judgment (Doc. No. 50) is

**DENIED**.

Dated:  March 20, 2008                     s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           Judge of United States District Court